**WESTMINSTER ELECTRIC CORPORATION, Plaintiff,**

v.

**SALEM ENGINEERING AND CONSTRUCTION, et al., Defendants.**

**No. 82–1781.**

United States Court of Appeals, First Circuit.

Argued May 4, 1983.

Decided July 21, 1983.

Donald L. Conn, Woburn, Mass., with whom Conn, Austin, Conn & Senior, Woburn, Mass., was on brief, for Salem Engineering and Const., et al.

John D. Biafore, Providence, R.I., with whom Goldman & Biafore, Providence, R.I., was on brief, for Westminster Elec. Corp.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and RE,* Chief Judge.

* Hon. Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

LEVIN H. CAMPBELL, *Chief Judge.*

This is a Miller Act action brought in the name of the United States for the use and benefit of Westminster Electric Corp. ("Westminster") against Salem Engineering and Construction ("Salem"), its surety, and the Army Corps of Engineers.[1] Salem and Westminster were, respectively, the general contractor and the electrical subcontractor for improvements to the Pease Airfield in Newington, New Hampshire. A series of contractual disputes and charges and countercharges of delay and lack of cooperation led to the termination of Westminster as subcontractor. It then brought this action for money due under the contract and other damages. Salem counterclaimed for alleged overpayments to Westminster and the cost of completing the electrical work after Westminster's termination. After a seven-day bench trial, the United States District Court for the District of New Hampshire awarded $176,820.31 to Westminster, and $11,815.43 to Salem on its counterclaim. Salem contests both awards. It also asserts that a new trial is necessary because of the judge's conduct and the admission of hearsay evidence. Westminster and the third-party defendant contest the judgment entered for Salem on its counterclaim.

## I. JUDGE'S VERBAL EXCHANGES WITH COUNSEL

■ The transcript reveals several tense exchanges between the district judge and Salem's lead counsel, Mr. Conn, a Massachusetts practitioner who was assisted by Mr. Maynard, a member of the New Hampshire bar. The judge was frequently impatient with Mr. Conn, and was anxious to move the case along. We find that most of the court's remarks, while sometimes sharp, were within the range of acceptable conduct given a judge's responsibilities and his discretion as to trial management. A judge is not a mere umpire. We regret to say, however, that in the following exchange, which occurred on the third day of trial, the court overstepped the bounds:

THE COURT: I don't know how they try cases in Massachusetts and Rhode Island. Brother Maynard, you'd get up here and you'd show him on cross-examination the dates. That's all.

MR. CONN: Pardon me, your Honor?

THE COURT: Would you take that sheet of paper on redirect and show him he's in error?

MR. CONN: But you seemed to think that I was taking so long on cross, so I tried to shorten it up for you, Judge. That's all, sir. I tried to cut down substantially on my cross-examination because I got the impression the Court thought I was lagging.

THE COURT: No, the Court didn't get that impression. The Court's getting a little irritated now. The Court never got that impression.

MR. CONN: Yes, your Honor.

THE COURT: And I'm not going to take this stuff from you.

MR. CONN: Pardon me?

THE COURT: I'm not going to take any guff from you. I'll tell you.

MR. CONN: I don't mean—

THE COURT: I know you haven't been feeling well, but I have the same problem too, so I'm not going to take any crap out of you.

MR. CONN: You'll get none from me, sir.

THE COURT: You're up in this courtroom as a privilege to practice in New Hampshire.

MR. CONN: I understand, sir.

THE COURT: You keep this up and Brother Maynard's going to take over as trial counsel.

I'm going to take a recess and you think about it.

Following the recess, Mr. Conn said, "I think it would be better if I withdrew." The court responded, "I'm not asking you to withdraw" and indicated that withdrawal was up to Conn's client. Upon being assured by Conn that he had discussed it with his client, the court acquiesced, and Mr.

---

1. The complaint against the Corps was dismissed before trial.

Conn withdrew from the case, leaving conduct of the trial to co-counsel, Mr. Maynard.

The judge's language was a breach of decorum; it also had the unfortunate effect of suggesting that Massachusetts attorneys were less welcome in the District Court of New Hampshire than New Hampshire attorneys. From the cold record at least, we find little on Mr. Conn's part to have provoked such a reaction. *See generally* Code of Judicial Conduct, Canon 3.

. We are less clear that the court's conduct was so abusive as to have necessitated Mr. Conn's immediate withdrawal. While the court's remarks and show of temper put counsel in a difficult position, the court told Mr. Conn after the recess that it was not asking him to withdraw.

Without condoning the incident, we do not believe that the judge's behavior was so abusive as to render the trial itself unfair.[2] For that reason we do not allow appellant's request for a new trial. *Goldman v. Fenn*, 252 F.2d 47, 48 (1st Cir.1958); 11 Wright & Miller, *Federal Practice & Procedure* ¶ 59.07 at 59–71 & n. 6 (1983). Salem continued to be represented by able, experienced, and, to all appearances, adequately prepared counsel. The court exhibited no animosity or bias towards Mr. Maynard.

## II. TESTIMONY OF ·ARTHUR BELLEMORE

Westminster's first and most important witness was Arthur Bellemore, its "internal coordinator" for the Pease Air Force Base project. Appellant asserts that much of Bellemore's testimony was hearsay and opinion about matters as to which he had no personal knowledge. We disagree. Bellemore was closely involved with the project from the beginning. His testimony was based on personal recollection and on documents that he had prepared and had been stipulated to by the parties. Appellee points in particular to Bellemore's testimony as to the condition of the generator building which, it says, was not supported by personal knowledge. We note, however, that the court accepted this testimony de bene only, and that substantially identical testimony was then given by Westminster's field superintendent, Mr. O'Connor. We find no error in the admission of Bellemore's testimony.

## III. DAMAGES

Salem contends the damages award has no reasonable basis in the evidence, and, in fact, neither party has been able to explain the damages awards to our satisfaction or, it would seem, to their own. We may have been able to discern the method from the papers forwarded to us from the district court. Westminster was awarded the full amount of damages it sought in exhibit 96, less interest, the storage charges for the generator,[3] and amounts entered for mileage expenses, lost time, and overtime.[4] The award on the counterclaim consists of backcharges by Salem to Westminster for: 1) costs incurred in unloading the generator (exhibit SSS), 2) amounts paid to Lowell Electrical Supply Co. (exhibit RRR), 3) the trucking charges for those items, and, harder to understand, 4) the first 16 of the 20 items in exhibit RRR, as well as, also for the second time, the trucking charges.

2. In reaching this conclusion, we also take into account that Salem did not object at the time of the incident nor did it seek a new trial below. *See, e.g., Bacon v. Kansas City Southern Ry.,* 373 F.2d 515, 517 (5th Cir.1967). While situations can be imagined where an objection might be excused, we are not certain that an objection would have been futile or inappropriate here. Accordingly, while we do not rest our decision upon the absence of an objection and a motion for new trial, we regard these as further reasons for our refusing to order a new trial.

3. There was conflicting testimony as to when the generator building was made weathertight. The court's calculation of damages would indicate that it credited Salem's evidence that the building was ready to receive the generator in the fall. On the other hand, in its opinion the court seems to accept that the storage charges did result from Salem's failure to winterize the building. This is only one of several seeming inconsistencies in the result below.

4. The figures do not compute exactly to the court's award because some digits were transposed in the addition.

While we may have reconstructed what it is the court below did, we still cannot tell why. The court made no findings of fact nor conclusions of law from which a theory of damages that would support the awards can be inferred. It may be, for example, that the court concluded mileage expenses were outside the contract, but it never said so. Particularly with regard to the counterclaim, we can perceive no reason for excluding some of the backcharges and including others. And the double counting of 16 of the items paid to Lowell Electrical Supply would seem to be a slip of the adding machine.

■ In these circumstances, we think it best that the present awards be vacated and the case remanded for recalculation of damages. The parties do not challenge the district court's findings that Salem broke the contract in terminating Westminster; that Westminster substantially performed under the contract; and that Westminster was entitled to recover under the contract and for various extras added during construction. Given these findings, the damages award should place Westminster in as good a position as it would have been in but for Salem's breach. It is thus entitled to the contract price, less any amounts already paid,[5] less what it would have cost Westminster to complete the project. *United States ex rel. Riley v. Diran Co.,* 597 F.2d 446 (5th Cir.1979). *See also United States ex rel. Heller Electric Co. v. William F. Klingensmith, Inc.,* 670 F.2d 1227 (D.C.Cir. 1982). *See generally* 5 *Corbin on Contracts* § 1094 (1964). This last amount is not necessarily the amount it cost Salem to complete the project, but what it would have cost Westminster to do so. *Id.*

Upon remand the court should make such findings and rulings as are necessary to explain the basis of the award, correct any arithmetic errors, and reconsider the calculation of damages (which may be the same or different in total amount as at present).

*See United States ex rel. Building Rentals Corp. v. Western Casualty & Surety Co.,* 498 F.2d 335, 340 (9th Cir.1974). If appropriate, the court should also identify what portion of its award is for lost profits and is to run only against Salem, pursuant to the pendent state claim, and not against the surety. *See Arthur N. Olive Co. v. United States ex rel. Marino,* 297 F.2d 70, 72 (1st Cir.1961).

*The awards of damages are vacated and the case is remanded for further proceedings consistent with this opinion.*

---

5. In calculating the damages, the district court seems to have assumed this amount is $249,-874.53. The evidence suggests the correct figure is $283,361.00, and the court may have so found in granting in part Salem's requested finding of fact number 12. On remand the court should resolve this issue.